BENNETT et al. v. FOSTER.

(Court of Civil Appeals of Texas. Ft. Worth. Nov. 1, 1913.)

1. MALICIOUS PROSECUTION (§ 58*)—WRONGFUL GARNISHMENT—EVIDENCE—FALSE REPRESENTATIONS—OPINION.

In an action for wrongful garnishment, in a suit against plaintiff as surety on notes executed for the value of stock sold to A., evidence that plaintiff was induced to sign the notes as surety by the representations of L., who was negotiating the transaction, that A.'s father would advance money with which to pay off the notes as soon as the sale of the stock to his son was consummated, etc., was objectionable as a mere expression of opinion on L.'s part, on which plaintiff had no right to rely.

[Ed. Note.—For other cases, see Malicious Prosecution, Cent. Dig. §§ 117–124; Dec. Dig. § 58.*]

2. MALICIOUS PROSECUTION (§ 58*)—WRONGFUL GARNISHMENT—EVIDENCE.

Where, in an action for alleged wrongful garnishment arising out of plaintiff's signing as surety notes of A. given by him in a stock transaction, plaintiff claimed that he was induced to sign the notes by L., and it was an issue in the case whether L. was an agent of defendants, evidence by defendant B., who conducted the negotiations in behalf of the other defendants as well as himself, that during their pendency plaintiff, A., and L. all came to the corporation's plant, investigated its financial condition, and later L. told him that plaintiff would make the trade if witness would give him 110 shares of stock in the corporation, which witness refused to do, and thereafter plaintiff and L. told witness that F., who was admittedly defendants' agent, had agreed to give 10 shares of his stock coming to him as a commission on the sale in order that the trade might be consummated, was admissible as tending to

show knowledge on the part of the witness that L. was assumed to be acting as the agent of all of the defendants in the sale of the stock to A. and a ratification of his own acts as such.

[Ed. Note.—For other cases, see Malicious Prosecution, Cent. Dig. §§ 117–124; Dec. Dig. § 58.*]

3. EVIDENCE (§ 317*)—HEARSAY.

In an action for wrongful garnishment arising out of plaintiff's signing as surety notes given by A. for the price of corporate stock, evidence that during the negotiations for the sale F. told plaintiff that L., who was attempting to complete the transaction, was to receive from defendants $1,000 of the stock as a commission for making the sale was objectionable as hearsay.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1174–1192; Dec. Dig. § 317.*]

4. EVIDENCE (§ 471*)—CONCLUSION OF WITNESS.

In an action for wrongful garnishment, a question to plaintiff, asking him, from the management of his business, his experience, capital, etc., what his reasonable income would be for the next three years after he was closed out, if he had not been interfered with by reason of the garnishment, was objectionable as calling for a conclusion; it being the province of the jury to estimate the profits plaintiff would have made in the future from all the facts and circumstances in evidence.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2149–2185; Dec. Dig. § 471.*]

5. TRIAL (§ 256*)—INSTRUCTIONS—MEASURE OF DAMAGES.

In an action for wrongful garnishment, an instruction that if the jury found that the writ was wrongfully issued, plaintiff should recover for such actual loss as was the natural, direct, and proximate result of the service of the writs was not objectionable as failing to give the jury any rule for measuring such actual damages, but was good as far as it went; it being the duty of defendants to request a more specific instruction if they desired it.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 628–641; Dec. Dig. § 256.*]

6. TRIAL (§ 251*) — INSTRUCTIONS — APPLICABILITY TO PLEADING.

Where no actual damages were claimed for the levy of a garnishment, the court properly refused a request to charge that the jury should measure the actual damages by the reasonable market value of the property, taken with the legal interest from the time of taking to the time of the trial.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 587–595; Dec. Dig. § 251.*]

7. TRIAL (§ 261*) — INSTRUCTIONS — PARTIAL INVALIDITY.

Where an instruction is partially bad, it may be entirely refused.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 484, 660, 671, 673, 675; Dec. Dig. § 261.*]

8. MALICIOUS PROSECUTION (§ 58*)—WRONGFUL GARNISHMENT—PLEADING — EFFORT TO COMPROMISE DEBT.

In an action for wrongful garnishment, it was not error to overrule defendants' special exception to a portion of plaintiff's petition, alleging an effort to compromise the debt for which the former suit was instituted, made prior to the garnishment, and to permit proof thereof.

[Ed. Note.—For other cases, see Malicious Prosecution, Cent. Dig. §§ 117–124; Dec. Dig. § 58.*]

9. MALICIOUS PROSECUTION (§ 52*) — MALICIOUS ISSUANCE OF WRIT—EXEMPLARY DAMAGES.

Where, in an action for wrongful garnishment, plaintiff's petition alleged that the gar-

nishment writ, as well as the attachment, was sued out wrongfully and maliciously and without probable cause, and actual damages were claimed, they were recoverable if proved; and hence exceptions to the claim for exemplary damages, on the ground that no actual damages were sufficiently pleaded, were properly overruled.

[Ed. Note.—For other cases, see Malicious Prosecution, Cent. Dig. § 100; Dec. Dig. § 52.*]

10. MALICIOUS PROSECUTION (§ 67*)—WRONGFUL GARNISHMENT—DAMAGES.

Where, in an action for wrongful garnishment, plaintiff claimed that the levy and subjection of certain shares of corporate stock resulted in damage, and that he lost an opportunity to exchange the stock for certain vendor's lien notes, the claim for the value of such notes with interest was a proper element of damage.

[Ed. Note.—For other cases, see Malicious Prosecution, Cent.Dig. §§ 155, 156; Dec. Dig. § 67.*]

11. MALICIOUS PROSECUTION (§ 67*)—WRONGFUL GARNISHMENT — LOSS OF BUSINESS — PROFITS.

Loss of prospective profits in plaintiff's business as the result of a wrongful issuance and service of garnishment cannot be recovered as actual damages, but may be looked to to estimate punitive damages, if a proper predicate is established therefor.

[Ed. Note.—For other cases, see Malicious Prosecution, Cent.Dig. §§ 155, 156; Dec. Dig. § 67.*]

12. MALICIOUS PROSECUTION (§ 64*)—WRONGFUL GARNISHMENT — DAMAGES — LOSS OF PROFITS—EVIDENCE.

In an action for wrongful garnishment alleged to have resulted in the loss of plaintiff's business as a broker, evidence *held* insufficient to establish the extent of plaintiff's loss and the value of his business, and not to justify a recovery of the profits he might have made in succeeding years.

[Ed. Note.—For other cases, see Malicious Prosecution, Cent.Dig. §§ 151–153; Dec. Dig. § 64.*]

Appeal from District Court, Baylor County; Jo. A. P. Dickson, Judge.

Action by J. S. Foster against R. G. Bennett and others. Judgment for plaintiff, and defendants appeal. Reversed.

Taylor & Humphrey, of Henrietta, Sporer & McClure, of Jacksboro, and J. A. Wheat, of Seymour, for appellants. D. A. Holman and Glasgow & Kenan, all of Seymour, for appellee.

DUNKLIN, J. This is the second appeal in this case, the disposition of the former appeal being reported in 152 S. W. 233. In a suit other than the present R. G. Bennett, W. A. Bennett, A. Power, and E. D. Power sued Chas. W. Abbott, and J. S. Foster upon three promissory notes executed by them, and also procured the issuance of an attachment upon an affidavit that Chas. W. Abbott was insolvent, and that J. S. Foster had disposed of his property in part for the purpose of defrauding his creditors. The attachment so procured was levied on certain real estate belonging to Foster. Later a writ of garnishment was sued out and served upon the Seymour Cotton Oil Company, in which company J. S. Foster owned 26 shares of the capital stock, and which was subjected to the writ. The present suit was in-

stituted by J. S. Foster against the plaintiffs in the former suit, to recover damages resulting from the wrongful issuance and service of the writ of garnishment. He alleged that he was a surety only upon the note upon which the former suit was instituted, and that he was not legally liable upon said note, for the reason that he was induced to sign the same by certain false and fraudulent representations made to him by the agents of the plaintiffs in the former suit. In the present suit a judgment was rendered in favor of Foster for the sum of $3,000 as actual damages, from which the defendants have appealed.

In his petition Foster alleges that by reason of the service of the writ of garnishment upon the Seymour Cotton Oil Company he was prevented from consummating a trade which had theretofore been negotiated, and by which he could and would have exchanged his 26 shares of stock in that company for vendor's lien notes for the principal sum of $2,600 and bearing interest at the rate of 10 per cent. per annum. He alleged that at the time of the service of the garnishment his stock was not worth more than 80 cents on the dollar of its face value, and that by this trade he would have realized 100 cents on the dollar, and would also have realized interest upon the notes during the pendency of the former suit. He further alleged that since the service of the writ no revenue had been derived from the stock. The damages claimed for the procurement and service of the garnishment was $520, the difference between the face value of the stock and its real value, and $758.26 for interest which he would have realized upon the vendor's lien notes had said trade been consummated.

In another paragraph of the petition plaintiff alleged that the writs of attachment and garnishment were sued out without probable cause therefor, and that in procuring them the defendants were actuated by malice; that for a period of 10 years next preceding the institution of that suit plaintiff was "engaged as trader and broker in buying and selling and trading in corporation stock, vendor's lien notes, and real estate and gin property as his occupation and support of himself and his family, which was well known to defendants." He further alleged that at the time of the levy of the writs he had a capital of from $15,000 to $20,000, which was employed in the prosecution of his business, also an unimpaired credit, and that for the period of 10 years next preceding the levy of the writs he had realized annual profits from his business of $2,000; that by reason of the service of the writs his credit has been impaired, and he had been left without sufficient capital to prosecute his business, resulting in a complete breaking up of his business; that by reason

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

of the service of the writ he had been unable to sell his capital stock garnished, and he had been thereby deprived of its use and benefit. Following those allegations occur the following: "That from plaintiff's past experience in the management of said business, and from the annual earnings and income made by him therein for the past 10 years, he would reasonably have made $2,-500 per annum, all of which he must lose and be deprived of on account of the wrongful, malicious, and oppressive use of the writs aforesaid, to his damage in the sum of $7,500 for the loss of his said earnings therefrom. And for damages to plaintiff's credit—the inconvenience, humiliation, and trouble occasioned by the breaking up of his business aforesaid, and because defendants in suing out and by service of said writs of attachment and garnishment did so wrongfully, and were actuated by malice, and with intent to vex and harass and oppress the plaintiff, and without probable cause—the said defendants, R. G. Bennett, W. A. Bennett, A. Power, and E. D. Power became liable to the plaintiff in the sum of $20,000 in exemplary damages."

It was further alleged in plaintiff's petition that the three promissory notes upon which the former suit was instituted were given in part payment for 104 shares of stock in the Seymour Mill, Elevator & Light Company, which were sold to Abbott by the defendants in this case, acting through their agents, M. R. Fuller, and T. W. Larkin; that Foster was surety only upon said notes for Abbott, and was induced to sign the same upon the false and fraudulent representations made to him by said agents; in effect, that the stock then being sold was worth $1.14 for each dollar shown upon the face of the stock; and that Abbott's father, who was wealthy, and who was anxious to get his son, C. W. Abbott, into business, would liquidate those notes so given, by advancements to his son as soon as C. W. Abbott could get settled into some kind of business. And further that the indebtedness of the Seymour Mill, Elevator & Light Company at that time would not exceed $13,000 over and above such indebtedness, as accounts and goods on hand belonging to the company were sufficient to liquidate; that each and all of said representations were untrue; that at the time said representations were made said company was insolvent, the stock so sold worthless, and that by reason of such misrepresentations plaintiff was not liable in any amount upon the promissory notes so signed by him. The jury were instructed, in effect, that if the alleged misrepresentations were made to Foster for the purpose of inducing him to sign the notes as surety for Abbott, and that he was induced thereby to sign them, then he was not liable thereon, and that if he was not liable upon those notes, then he could recover the damages actually sustained by him as a result

of the service of the writ of garnishment mentioned above.

[1] Plaintiff testified in part as follows: "I was induced to sign three notes by the representations which Fuller had made to me that the stock was worth $1.14 on the dollar; that there was enough stock and merchandise, accounts and money, on hand with which to meet all of the indebtedness of the mill due and owing to the First National Bank, and to the statements that Larkin made to me about Abbott, he said that Abbott's father was very wealthy, that Mr. Abbott had married lately into a very wealthy family, and that his wife was spending too much money; that Abbott's father had spoken to him some two or three times, and he, Larkin, said that as soon as Abbott's father found out the trade had been made, the money would be sent him, and that the money would be sent him in 30 days, and that he, Larkin, was satisfied that it would be here in 30 days. These statements induced me to sign the notes." That part of the testimony quoted relative to what Larkin told the plaintiff was objected to by the defendants at the time it was offered, one of the grounds of objection being, in effect, that such statements were hearsay, and not such as plaintiff had the legal right to reply on as an inducement to sign the note. We are of the opinion that upon this objection the testimony should have been excluded. Clearly the gist of the alleged statements by Larkin was an assurance that Abbott's father would advance the money with which to pay off the three notes signed by his son and Foster as soon as the sale of the stock to his son was consummated. This was merely an expression of opinion and belief on the part of Larkin that Abbott's father, who was in no way liable upon the notes, would advance to his son funds sufficient to satisfy them, and such opinion would not constitute a legal basis for Foster to escape liability upon the notes.

[2] The issue whether or not Larkin was the agent of the defendants in this case in the sale of the stock above mentioned to Abbott was sharply contested by the defendants, each and all of whom testified that Fuller was the sole agent to negotiate such sale; that Larkin was never employed by them, and never acted as such agent within their knowledge; and error has been assigned to the refusal of an instruction requested by defendants that the jury should not consider, for any purpose, the testimony of plaintiff, Foster, relative to the alleged misrepresentations made to him by Larkin, and which he says in part induced him to execute the notes. The defendant W. A. Bennett, who seems to have conducted the negotiations in behalf of the other defendants, as well as for himself, in the sale of the stock, further testified that during those negotiations Foster, Abbott, and Larkin all came down to the mill and investigated its

financial condition; that later Larkin came to him and told him that Foster would make the trade if Bennett would give Foster 110 shares of stock, which Bennett refused to do, and thereafter Foster and Larkin came to the mill and told Bennett that Fuller had agreed to give up 10 shares of stock coming to him as a commission on the sale in order that the trade might be consummated, to which proposition Bennett agreed after Fuller instructed him to do so. We are of the opinion that this evidence tended to show, although perhaps to a slight extent only, a knowledge on the part of W. A. Bennett that Larkin was assuming to act as the agent of the defendants in the sale of the stock to Abbott, and a consequent ratification of his acts as such agent; and therefore appellant's tenth assignment of error is overruled.

[3] Plaintiff further testified that during the negotiations for the sale of the stock to Abbott, Fuller told plaintiff that Larkin was to receive from the defendants $1,000 of the stock in the same company as a commission for making the sale to Abbott. This testimony was objected to on the ground that it was hearsay. Evidently it was offered for the purpose of proving Larkin's agency to sell the stock to Abbott, and clearly it was subject to the objection urged. Accordingly appellant's eleventh assignment of error is sustained.

[4] The following question was propounded to the plaintiff: "Now, from the management of your business, your experience in the management of that business, and the capital you had, can you reasonably state to the jury what your reasonable income would have been for the next three years after you were closed out, if you had not been interfered with?" To this question plaintiff answered as follows: "I ought to have made as much in the next three years as I had made, which was about $2,000 or $2,500 per annum." Defendant objected to the testimony upon the ground that it was a conclusion. This testimony was in support of plaintiff's claim for loss of profits in his business occasioned by the service of the writ of garnishment. It was exclusively the province of the jury to estimate the profits that plaintiff would make in the future, from all the facts and circumstances in evidence, and the objection made to this testimony should have been sustained. It follows from this conclusion that appellant's twenty-fourth assignment of error should be sustained.

[5] Complaint is made of two different paragraphs of the court's charge in which the jury were instructed, in effect, that in the event of a finding that the writs of garnishment and attachment were wrongfully issued, plaintiff should be allowed damages for such actual loss as was the natural, direct, and proximate result of the service of such writs. No actual damage was claimed in the petition for a wrongful levy of the writ of attachment, and it was possible error for the court to base any recovery of actual damages upon a wrongful issuance of that writ, but the instruction is not assailed upon that ground; the only objection being that such instruction did not give the jury any rule for measuring such actual damages. Aside from the criticism above suggested by us, we think the instruction was good so far as it went; and, if the defendants desired a more specific direction to the jury for the computation of the damages, they should have presented to the trial judge a request therefor.

[6, 7] Another error is assigned to the refusal of plaintiff's requested instruction No. 14. In part, that instruction was that the jury should measure the actual damages for the wrongful suing out of the attachment and garnishment by the reasonable market value of the property taken, with the legal rate of interest thereon from the time of taking to the time of the trial. As no actual damages were claimed for the levy of the writ of attachment, this portion of the instruction was inapplicable; and, as other portions of the requested instruction to the actual loss sustained by the plaintiff for wrongfully suing out and serving the writ of garnishment were somewhat confusing and inapt, there was no error in refusing the entire instruction.

Another error assigned is to the refusal of an instruction requested by the defendants that in no event could plaintiff recover the 10 per cent. interest stipulated in the vendor's lien notes for which he would have traded his stock that was garnished. This contention was discussed and decided adversely to appellants upon the former appeal, and we still concur in the views there expressed by us.

The trial court instructed the jury quite at length upon the issue whether or not Fuller and Larkin were legally defendant's agents in the trade by which the stock was sold to Abbott, and plaintiff, Foster, was induced to sign Abbott's notes given in consideration therefor. By the sixth, seventh, and eighth assignments of error complaint is made of errors in those instructions. One of the objections urged to the instructions is that they are upon the weight of the evidence in assuming that Larkin was a joint agent of defendants with Fuller. We do not think the instructions are subject to this criticism. Another ground of complaint is that no evidence was introduced tending to show the agency of Larkin. This objection was untenable, for the reason that, as noted already, we think there was some evidence tending to establish such agency. We do not wish to be understood as approving the instructions given by the court, and last referred to, as we think they are subject to other criticisms not presented by the assign-

ments, and which will likely be avoided upon another trial.

[8] For reasons stated in our opinion on the former appeal there was no error in overruling defendants' special exception to that portion of plaintiff's petition alleging an effort to compromise the debt for which the former suit was instituted, made before the attachment was issued, and in admitting testimony upon the last trial in support of those allegations.

[9] In plaintiff's petition it was alleged that the garnishment writ, as well as the attachment, was sued out wrongfully and maliciously, and without probable cause. As noted already, actual damages were claimed which we are of the opinion were recoverable if established. Hence the exceptions to the claim for exemplary damages on the ground that no actual damages were pleaded were properly overruled. If there was error in overruling other special exceptions seeking more specific information relative to the name of the payee, payer, date of note, date of maturity, etc., such error becomes immaterial in view of another trial, since appellants are now fully informed upon those issues from the evidence introduced on the last trial.

[10] Nor was there error in overruling different special exceptions to the claim for the value of the vendor's lien notes, with interest, which plaintiff alleged that he would have received in exchange for his stock but for the service of the writ of garnishment, for the reasons discussed on the former appeal. See, also, Trawick v. Martin Brown Co., 79 Tex. 460, 14 S. W. 564.

[11] Appellants insist that the loss of prospective profits in business, which appellee alleges resulted from the issuance and service of the writ of garnishment, could not in any event be recovered as actual damages, but could be looked to only for the purpose of estimating punitive damages if the proper predicate should be established therefor. This contention is sustained by numerous decisions of our Supreme Court. Kaufman v. Armstrong, 74 Tex. 65, 11 S. W. 1048; Kauffman v. Babcock, 67 Tex. 241, 2 S. W. 878; Miller v. Jannett, 63 Tex. 82; Wallace v. Finberg, 46 Tex. 35. Appellee invokes the following decisions of our Supreme Court to sustain his contention that such loss of prospective profits is recoverable as actual damages. City of San Antonio v. Royal (Sup.) 16 S. W. 1101; G. H. & S. A. Ry. Co. v. De Groff, 102 Tex. 433, 118 S. W. 134, 21 L. R. A. (N. S.) 749; also the following decisions by the Court of Civil Appeals for the Third District: American Construction Co. v. Caswell, 141 S. W. 1013, and American Construction Co. v. Davis, 141 S. W. 1019. The case of City of San Antonio v. Royal, was one for the recovery of damages for the destruction of the business of a huckster by the removal of his trading stand. The case

of Railway v. De Groff was a suit in which an injunction was sought by De Groff to restrain the railway company from obstructing the street in front of plaintiff's hotel, which obstruction caused a depreciation in plaintiff's hotel business, resulting from inconvenience to the customers of the hotel in reaching it. In that case our Supreme Court held that the injunction prayed for would not lie for the reason that plaintiff had a right of action at law for damages for loss of business resulting from such obstruction. American Constr. Co. v. Caswell, supra, was a suit by Caswell, a merchant, to recover damages for loss of profits in his business on account of the erection of a fence and other buildings on a lot adjoining plaintiff's store, resulting in a diversion of customers from plaintiff's place of business, and the obstruction of light and air rendering the store hot, dark, and uncomfortable. American Constr. Co. v. Davis, supra, was a companion case to the case last noted, by Davis, also a merchant, who sued for damages of the same character. The cases relied on by appellants were suits for damages resulting from the levy of attachment writs wrongfully issued. In the opinions relied on by the appellee no reference is made to the decisions first noted. Whether or not there is a conflict between these two lines of decisions it is not necessary for us to determine, for we feel it our duty to follow the rule announced in the decisions first cited as being more directly applicable to the issues in the present case. Based upon that conclusion, we are of the opinion that actual damages claimed in this suit by the appellee for loss of prospective profits in his business were not recoverable, although such loss could be proven for the purpose of assessing exemplary damages, provided a proper predicate should be established therefor.

[12] We are of the opinion, further, that even though such profits as alleged in plaintiff's petition were recoverable as compensatory damages, the evidence introduced upon the trial was too indefinite and uncertain to warrant such a recovery. The only evidence we have found in the record offered for the purpose of showing such loss of profits was that of the plaintiff, Foster, himself. He testified in part as follows: "In the year 1900 I divided up with my children, my first wife having died, and I had property that I valued at $1,800. On January 1, 1910, I was worth about $25,000, which was the income of my property from 1900 to 1910, and from which I estimate that my annual income during that time must have been at least $2,000 or $2,500 per year, and from the management of my business, my experience in the management of that business, and the capital I had, I should reasonably have made $2,000 or $2,500 during the next three years, and since the running of these garnishments on my property I have not been able to carry on my business. I had nothing left with which

to carry on my business to make the annual earnings I had been the years before. My credit was good at the banks, and in the commercial world, I could borrow money from any one who had it to loan and who knew me without collateral. Nobody ever asked me for collateral or security. I have borrowed the limit several times from these banks here, $7,000 without security, and since the attachments and garnishments I have had to put up security for every dollar I borrowed. I have not asked any one to credit me without security. * * * My main business has been that of a trader, buying and selling, and Mr. Bennett has lived here for a number of years, and was intimately acquainted with my business. All the property of mine that was reached by the writs of garnishment was the 26 shares in the oil mill. I do not know what my annual earnings were for any one year, cannot say what they were in 1900, 1901, 1902, and 1903, or any other year during the 10 years from 1900 to 1910. I don't know exactly what trades, nor how I made it. Part of the time I was in the grocery business, part of the time in the gin business, a part of the time working on a salary for W. R. Martin Grocery Store. I know of a few trades I have made." This witness then detailed three or four trades that he made upon which he made a profit, consisting of the purchase and sale of real estate, an electric light plant and gin, all of which property he has since sold, and further testified that he had realized a profit from the operation of the electric light plant, and also from the operation of the gin. After detailing those transactions, he continued: "I don't know what other trades I have made, and I couldn't tell you without looking on the record, or something of that kind, as I have kept no account in the last ten years."

It is well established by all those authorities in which damages for the loss of profits in business are allowed that there must be sufficient data to enable the jury, with a reasonable degree of certainty and exactness, to ascertain the loss and that damages will not be allowed where the losses are merely speculative and conjectural and incapable of ascertainment with reasonable definiteness. See Railway v. De Groff, supra. As noted already, in the case last cited, the business which plaintiff was conducting was that of hotel keeper. In the case of City of San Antonio v. Royal, plaintiff was engaged in operating a huckster's stand, and in each of the cases of Am. Constr. Co. v. Caswell and Am. Constr. Co. v. Davis, supra, the plaintiff was operating a store for the sale of merchandise. In each of the four cases last mentioned it appears that the business was an established business. It is doubtful whether the business of the appellee in this case, being that of a mere speculator in buying and selling real estate, stock, etc., was of that fixed and certain character which would be a proper basis for a recovery of damages even under the four last-mentioned decisions. At all events, we are of the opinion that the evidence introduced upon the trial of the present case was insufficient to sustain appellee's claim for damages for loss of profits in his business, even under the four last-named decisions, as there were no facts detailed by him in his testimony relative to his business transactions during the past 10 years next preceding the trial from which the jury could ascertain with reasonable certainty the amount of profits lost. From plaintiff's own testimony only a small part of his total capital of $25,000 was tied up by the service of the writ of garnishment. He was left free to operate upon the capital not affected by the garnishment, and did operate the same. He testified that before the levy of the garnishment he could borrow money without giving security therefor, but does not give any estimate of the amount he could have so borrowed. The gravamen of his complaint seems to be that he had lost his credit with the banks to this extent, and yet, according to his testimony, he never attempted to borrow money without offering collateral after the garnishment was served. He does not testify to what uses he would have applied any capital he might have borrowed if his former credit had not been impaired, what investments he could and would have made with such funds, nor does he give the jury any information from which they could estimate whether or not such investments, if any, would have been profitable. As noted above, the aggregate of damages claimed for the loss of appellee's opportunity to exchange his 26 shares of stock for the vendor's lien notes was $1,278.26. In no event would the record in this cause support a recovery for a sum greater than that amount; and, accordingly, appellants' first assignment of error, complaining that the trial court erred in overruling a motion for new trial on the ground that the verdict was excessive, is sustained.

For the errors indicated, the judgment is reversed, and the cause remanded for a new trial.